| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY |
| **Caption in Compliance with D.N.J. LBR 9004-2(c)**<br><br>**WONG FLEMING**<br>821 Alexander Road, Suite 200<br>Princeton, New Jersey 08540<br>Gregory Johnson, Esq.<br>(609) 951-9520<br>(609) 951-0270 Facsimile<br>gjohnson@wongfleming.com<br>*Proposed Counsel for Debtor and Debtor in Possession*<br><br>**DELBELLO DONNELLAN WEINGARTEN<br>WISE & WIEDERKEHR, LLP**<br>One North Lexington Avenue, 11th Floor<br>White Plains, New York 10601<br>Robert L. Rattet, Esq.<br>Dawn Kirby, Esq.<br>Julie Cvek Curley, Esq.<br>(914) 681-0200<br>(914) 684-0288 Facsimile<br>rrattet@ddw-law.com<br>dkirby@ddw-law.com<br>jcvek@ddw-law.com<br>*Proposed Co-Counsel for Debtor and Debtor in Possession* |

| | |
|---|---|
| In re:<br><br>**LAFAYETTE YARD COMMUNITY DEVELOPMENT CORPORATION,**<br><br>                    Debtor. | Chapter 11<br>Case No. |

**AFFIDAVIT OF JOYCE KERSEY IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION, "FIRST DAY MOTIONS" AND EMERGENCY INTERIM ORDERS AUTHORIZING THE DEBTOR TO SATISFY, AND, TO THE EXTENT APPLICABLE, DIRECTING PAYROLL BANKS TO HONOR, CERTAIN PRE-PETITION GROSS SALARIES AND PAYROLL TAXES OF ITS <u>EMPLOYEES PENDING HEARING ON "FIRST DAY MOTIONS"</u>**

STATE OF NEW JERSEY   )
                      )SS.
COUNTY OF MERCER      )

      JOYCE KERSEY, of full age, being duly sworn according to law, upon her oath, deposes and states:

      1.    I am the Chairperson of the Board of Lafayette Yard Community Development Corporation **("LYCDC")**, the within debtor and debtor-in-possession (the "**Debtor**"). LYCDC is non-profit organization that owns the Lafayette Yard Hotel and Conference Center, formerly the Trenton Marriott Downtown, 1 West Lafayette Street, Trenton, New Jersey 08608 (the "**Hotel**"). I have served as Chairperson since March 11, 2013, and as a Board member since February 14, 2011.

      2.    I am fully familiar with the Debtor's business affairs and operations, and am duly authorized to make this affidavit on the Debtor's behalf.[1] I submit this affidavit (a) in support of the Debtor's petitions for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of this Chapter 11 case, and (c) to provide general information about the Debtor's business operations that are germane to the Debtor's "First Day Motions" (as defined below). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtor's business and furtherance of its restructuring efforts.

---

[1] The factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtor's operations and financial condition.

2

3. Part I of this Affidavit provides an introduction to the Debtor and its Chapter 11 cases. Part II provides an overview of the Debtor's organizational structure and its business. Part III describes the circumstances giving rise to the commencement of this Chapter 11 case. Part IV sets forth a summary of the First Day Motions and the Debtor's intentions for reorganizing and emerging from Chapter 11.

## I. INTRODUCTION

4. On September 23, 2013 (the "**Filing Date**"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Filing Date, the Debtor has remained in possession of its assets and continued to manage its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. The Debtor's case has been initiated to effectuate a reorganization, with the goal of selling the Hotel, through a competitive bid and auction process, to a suitable buyer. The Debtor also seeks to use the Chapter 11 process to resolve, in an orderly manner, creditors' claims against the Debtor, including claims resulting from the transition from a managed Marriott Hotel to an independent hotel without a "flag" which resulted in a significant reduction in the Debtor's revenues.

## II. FACTUAL BACKGROUND

### A. The Debtors' Business and Organizational Structure

6. LYCDC was established as a non-profit corporation on June 8, 1998 to assist the City of Trenton and State of New Jersey with a redevelopment project, i.e., the construction of a hotel in downtown Trenton.

7. On September 6, 1999, LYCDC adopted Bylaws establishing financial oversight of the Hotel, select officers, and retain agents, including authority to select a management company to run the day-to-day operations. LYCDC consists of a seven member Board of

Trustees. The board has full authority to elect officers, employ agents, establish and appoint committees.

8. By Deed dated April 26, 2000, the 1 West Lafayette Street property, consisting of 3.7 acres of real property, designated Lot 106, Block 2, was conveyed by the City of Trenton, for itself and in its capacity as the City of Trenton Parking Utility to the LYCDC for the sum of $675,000.00. The Deed is recorded with the Mercer County Clerk on April 26, 2000 in Book 03810, Page 0060.

9. Subsequently, LYCDC obtained tax exempt bond funding and loans totaling $48 million to construct a 197 room hotel and conference center. Debt financing for the construction and acquisition of the Hotel was obtained with the issuance by LYCDC of bonds in 2000 in the approximate amount of $31,000,000 (the **"Series 2000 Bonds"**). The Series 2000 Bonds were subsequently refinanced by bonds issued by LYCDC in 2001 (the **"Series 2001 Bonds**"). The remaining principal balance of Series 2001 Bonds was refinanced by bonds issued by LYCDC in 2012 (the **"Bonds"**).

10. Debt financing for the construction and acquisition of the Hotel was also obtained by the following loans to LYCDC: $5,000,000.00 loan from the State of New Jersey; $2,789,722.00 Economic Development Authority loan; $697,436.00 Capital City Redevelopment Corps. (CCRC) loan; $675,000.00 State of New Jersey land loan; and $7,396,259.00 pursuant to a note payable to the Trenton Parking Authority.

11. The Hotel opened in April 2002 under a Marriot franchise known as the Trenton Marriot at Lafayette Yard. The hotel and conference center included an attached 657 space parking garage. However, the parking garage is owned by the Trenton Parking Authority, a separate municipal entity.

4

12. Initially the Hotel was managed by Marriot International. On May 29, 2008, LYCDC hired Waterford Hotel Group, Inc. of Waterford, Connecticut, to manage and operate the Hotel from May 29, 2008 until June 15, 2013. The franchise agreement with Marriott expired on June 15, 2013, and since that date, the Hotel has been operating as an independent hotel. On May 1, 2013, LYCDC hired Marshall Hotels and Resorts, Inc. ("**Marshall**") to manage the Hotel's operations. Marshall took over on June 15, 2013 and is operating the Hotel.

13. LYCDC hired Acquest Reality Advisors, Inc., ("**Acquest**") from Bloomfield Hills, Michigan to serve as the Asset Manager with a 15 year contract effective April 26, 2000 to April 25, 2015. On June 10, 2013, the Board voted to terminate the contract of Acquest as per its terms since it was hiring a new manager.

14. Under the Management Agreement, LYCDC owns the Hotel but it is operated exclusively by Marshall. Marshall is responsible for management of all employees including operations of the facilities. LYCDC grants Marshall exclusive control over the operating and payroll accounts to employees, property expenses, taxes and so forth. As of the Filing Date, Marshall has approximately 71 employees, consisting of 6 full-time salaried employees and 65 hourly employees.

15. Leading up to the June 15, 2013 transition date, LYCDC sought financial assistance from the City of Trenton and State to adequately fund the Hotel operations. The City provided $295,000.00 as a cash call and $200,000.00 in transition aid this year. In May 2013 as part of its plan to renovate and upgrade the Hotel, LYCDC began negotiating with Wyndham Hotels for a franchise. Wyndham inspected the facility and offered to extend a franchise opportunity if the City would guarantee funding of $2,500,000.00 in property improvements. In

5

June 2013, LYCDC asked the City and State to provide $3,000,000.00 in bond funding but the City failed to pass a bond ordinance providing the loan approval.

16. Twelve (12) interested parties have recently expressed an interest in buying the Hotel.

17. Following the contemplated sale of the Hotel, the Debtor, as a corporation, must orderly wind down its operations in compliance with New Jersey law and relevant tax codes.

**B.** **Capital Structure**

    (i)     Secured Debt

18. The Bonds are the Debtor's senior debt obligations and the Debtor has obligations for unpaid principal and unpaid interest on the Bonds as well and fees and expenses of Wells Fargo Bank National Association, not individually but as indenture trustee for the Bonds (the **"Bond Trustee"**). The Bond Trustee asserts that the aggregate principal amount of the Bonds outstanding is $14,425,000 and the accrued put unpaid interest on the Bonds is $214,900.31 as of September 13, 2013. The per diem interest on the Bonds is $1,326.55. The Bonds are secured by a first priority lien on and security interest in the Hotel premises located at One West Lafayette Street in Trenton, New Jersey, and the Debtor's other assets. While the LYCDC owns the Hotel, upon the payment in full of the principal or redemption price of the Bonds, the LYCDC has obligations to transfer all of its rights in the Hotel to the City of Trenton.

19. The Bonds are also supported by a Subsidy Agreement between the City and the LYCDC initially dated as of April 1, 2000 and as reaffirmed and amended as of March 30, 2012. The Subsidy Agreement states that the obligation of the City under such Subsidy Agreement shall not be affected, modified or impaired upon the occurrence of the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the

6

benefit of creditors, reorganization, arrangement, composition with creditors or readjustment or other similar proceedings affecting the Corporation or any party to the Financing Documents (as defined in the Subsidy Agreement) or any of the assets of any of them, or any allegation or contest of the validity of the Subsidy Agreement, or the Corporation's authorizing documents.

20. There are two junior lienholders on the Hotel. To secure their obligations to the lenders, LYCDC, the borrower, granted security interests in the real property, and substantially all of its assets, to Capital City Redevelopment Authority on March 2, 2005, and the New Jersey Economic Development Authority on May 1, 2005.

### III.     FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING

#### A.     The Transition from a Marriott Hotel

21. For many of the 12 years of its operations, the Marriott Trenton struggled to make a profit and even failed to cover the debt service and operations. On several occasions, LYCDC made cash calls to the City for funds to cover operations, including as late as April 2013 for $295,000.00. Prior to January 2013, LYCDC adopted plans to operate the Hotel under a Wyndham flag with a new management company. After a lengthy selection process, LYCDC selected Marshall to manage the Hotel under the Wyndham flag. It was universally agreed that the Hotel was in need of improvements because it had not been renovated since it opened in April 2002. Wyndham inspected the facility and offered to extend a franchise opportunity if the City would guarantee funding $2,500,000.00 in property improvements. In June 2013, LYCDC asked the City and State to provide $3,000,000.00 in bond funding; but the City did not pass a bond ordinance providing the loan approval.

22. Due to the current economic conditions, the Hotel's significant long term debt of approximately $29.9 million and a sharp decline in operating revenues forecasted to the end of the year, LYCDC has determined that a Chapter 11 filing is the only way to protect the interests

7

of the Hotel and to insure that and orderly and maximum value sale is possible. In particular, Marshall has projected an operating deficit exceeding $880,000.00 this year, partly due to the loss of business and room revenue at the Hotel. Moreover, the weekly payroll obligations are between $38,000.00 to $42,000.00. LYCDC is currently struggling to meet the payroll on a weekly basis. LYCDC has met with City representatives and state officials regarding the financial needs but each have indicated that additional funding is not available from City or state sources for the Hotel.

### IV.    THE PURPOSE OF THE CHAPTER 11 FILINGS

23.    The Mayor of the City, Tony Mack, has made it clear that the Hotel should be sold. LYCDC has determined that given the long term debt on the Hotel, and with no real prospects of repaying all the debt, the best course of action is to sell the Hotel as part of a structured bankruptcy process. The Debtor presently intends to, under separate application, seek court approval for a process to market and then sell its assets at a public auction to the highest and best price. The Debtor also intends to obtain financing for ongoing operations of the Hotel during the Chapter 11 case and administer the reorganization process leading to a sale.

24.    To avoid the potentially disruptive impact the commencement of this Chapter 11 case might have on the Debtor's business operations, to facilitate the Debtor's orderly transition into Chapter 11, and to increase the Hotel's value for sale, the Debtor has requested the Court to consider, on an expedited basis, the following substantive motions filed simultaneously with its Chapter 11 petition (collectively, the "**First Day Motions**"):

>    (a)    Application in support of the Debtor's Motion for Orders: (i) authorizing the Debtor to (a) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross salaries, payroll taxes and related obligations to or for the benefit of the Debtor's employees, and (b) honor, in its discretion, pre-petition sick, vacation, personal, and similar themed

                days; and (ii) granting other related relief (the "**Employee Wages Motion**");

(b)     Application in support of the Debtor's Motion for an Order authorizing it to continue using its existing bank accounts and business forms (the "**Bank Account Maintenance Motion**");

(c)     Application in support of the Debtor's Motion for Orders: (a) granting interim relief pursuant to 11 U.S.C. § 366(b); (b) authorizing the payment of adequate assurance for post-petition utility services; (c) fixing a final hearing date to determine the sufficiency of adequate assurance; and (d) granting other related relief (the "**Utility Motion**");

(d)     Application in support of the Debtor's Motion for an Orders (a) authorizing the Debtor's interim and final use of cash collateral pursuant to 11 U.S.C. §§ 361 and 363 and granting adequate protection and (b) scheduling a final hearing pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 (the "**Cash Collateral Motion**");

(e)     Application in support of the Debtor's Motion for Orders (a) authorizing the Debtor (i) to obtain post-petition financing and granting security interests and superpriority administrative expense status pursuant to 11 U.S.C. § 364; (ii) to use cash collateral pursuant to 11 U.S.C. § 363; (iii) to provide adequate protection pursuant to 11 U.S.C. § 361; and (b) scheduling a final hearing and establishing related notice requirements (the "**DIP Financing Motion**"); and

(f)     Application in support of the Debtor's Motion for an Order extending the time for the Debtor to file its schedules (the "**Schedules Motion**").

25.     In addition to the First Day Motions, the Debtor has filed an Application for entry of an order scheduling a hearing on shortened notice on the First Day Motions. The relief sought in the First Day Motions is immediately necessary to enable the Debtor to operate effectively as a debtor-in possession following the commencement of its chapter 11 case.

26.     The purposes of the First Day Motions include, among other things, to: (a) ease the Debtor's transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filing; (b) minimize disruption of the Debtor's ability to operate in the ordinary course of business; and (c) maintain and bolster employee morale so as to reduce employee attrition during the Debtor's Chapter 11 proceedings, which would have a detrimental impact on the Debtor's

9

business and customer service. Each of the First Day Motions is crucial to the Debtor's restructuring efforts and preservation of the Debtor's assets and estate.[2]

27. I submit that the relief request in the First Day Motions should be heard and determined on an expedited basis in order to allow the Debtor to continue its normal business operations without any interruption, which interruption that could severally detriment the Debtor's ability to successfully reorganize.

**A. Employee Wages Motion**

28. Due to the timing of this Chapter 11 filing, the Debtor respectfully requests, among other things, entry of the Emergency Interim Order authorizing the Debtor to satisfy and, to the extent applicable, directing any payroll banks to honor, certain pre-petition gross salaries and payroll taxes for its employees (the "**Emergency Interim Order**") submitted herewith.

29. As set forth in the Payroll Motion, payroll checks were distributed on September 20, 2013, to those employees who do not receive direct deposit. Given the possibility that some of those checks, as well as checks from the Debtor's September 13 and 6 payrolls, might not have cleared or might not be presented until after the Filing Date, and the possible need for the employees to be able to cash their payroll checks before the hearing on the First Day Motions, the Debtor respectfully requests that the Court enter the Emergency Interim Order to ensure that any payroll banks presented with the September 6, 13 and 20, 2013 payroll checks honor those checks.

30. Furthermore, with respect to the Employee Payroll Motion, the Debtor's employees are critical and necessary for the Debtor's ongoing operations. Should the Debtor be

---

[2] For a more detailed description of the First Day Motions, the Debtor respectfully refers the Court and parties-in-interest to the respective First Day Motions.

10

rendered unable to pay its employees their wages as scheduled, there would be irreparable harm caused to the employee morale and possible loss of employees. Should this happen, the Debtor's reorganization efforts would certainly be impaired.

### B.  Bank Account Maintenance Motion

31.  With respect to the Bank Maintenance Motions, numerous transactions are conducted on a daily basis. Requiring the Debtor to close its existing account and open new accounts would cause great disruption, confusion, and delay in the Debtor's cash flow ability, and jeopardize the Debtor's ongoing operations and reorganization efforts as well.

### C.  Utility Motion

32.  Uninterrupted utility Services are essential to the Debtor's business operations while its chapter 11 case is pending. Any interruption of utility services would severely disrupt the Debtor's business and damage the Debtor's chances to obtain the highest and best offer at a sale under Bankruptcy Code Section 363.

33.  In the normal conduct of its business, the Debtor obtains gas, water, electric, telephone, cellular and other services from many utility providers (the "**Utility Companies**"). Attached to the Utilities Motion as Exhibit A is a list of substantially all of the Utility Companies that provide such utility services to the Debtor.

34.  The Debtor is dependent on electricity to operate the Hotel. In addition, the Debtor's facilities are dependent on telephone service to conduct ordinary and regular business associated with operating a Hotel. The Debtor is also dependent on continued water service to maintain sanitary dining and lavatory facilities for guests and employees.

35.  The Debtor's utility services are critical to the day-to-day operations of the Hotel. If the Utility Companies are permitted to terminate service on the 21st day after the Petition Date, the Debtor will be forced to cease operation of the Hotel resulting in substantial disruption and

loss of revenue and value. Any interruption of utility service would severely disrupt the Debtor's business, endanger the employees and guests, and diminish the value of the Hotel, which the Debtor intends to sell within its Chapter 11 case.

36. With the sole exception of Veolia Energy, the Debtor has a good record of timely payment pre-petition. The Debtor seeks to continue to pay the Utility Companies by continuing to pay them in the ordinary course of business and to provide the Utility Companies with administrative expense priority status pursuant to Bankruptcy Code §§ 503(b) and 507(a) for utility service provided to the Debtor after the Petition Date. The Debtor believes its payment history and the priority status of post-petition claims provide adequate assurance to the Utility Companies of payment for future services.

37. Additionally, the Debtor seeks a determination from the Court that a deposit equal to 50% of the average monthly usage over a twelve month period will be deemed sufficient if a Utility Company requests additional adequate assurance.

**D.     Cash Collateral Motion**

38. With respect to the Debtor's Cash Collateral Motion, without immediate relief from the Court authorizing the Debtor's use of cash collateral of its secured creditors, the Debtor would be unable to conduct its normal business operations, thereby crippling the Debtor's ongoing operations and jeopardizing its reorganization efforts. I submit that the terms set forth in the motion for the use of the Cash Collateral are fair and reasonable, and reflect Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

**E.     DIP Financing Motion**

39. As stated hereinabove, the Debtor is currently operating at a loss, and has inadequate cash flow and working capital. Prior to the Filing Date, the Debtor had exhausted substantially all of its cash assets, and was left in a position without cash to continue its

operations. The Debtor explored numerous avenues of lending pre-filing, but, however, was unable to find any lender willing to lend to the Debtor given its current debt structure. The only avenue by which any lender would consider lending to the Debtor would be if the proposed lender would "prime" the existing secured creditors, under Section 364(d) of the Bankruptcy Code.

40.     In order to preserve the Debtor's assets and value as a "going concern" pending a sale in this Bankruptcy Case, DIP Financing is necessary to provide the Debtor with adequate cash flow to meet its very minimum operating expenses and administrative costs of maintaining its estate.

41.     As set forth in the budget annexed to the DIP Motion as Exhibit "__," the Debtor immediately requires financing to meet its ordinary and necessary expenses. The Debtor does not have the cash reserves necessary to sustain its operations, and thus immediate funding is necessary to prevent irreparable harm and damage to the Debtor's estate.

**F.    Schedules Motion**

42.     With respect to the Schedules Motion, the Debtor does not anticipate being able to review its books and records and work with its counsel to prepare the Schedules within the fifteen (15) days following the Filing Date, in addition to the normal duties and responsibilities borne by the Debtor's employees and officers.

## V.     CONCLUSION

43. The First Day Orders will enable the Debtor to stabilize and continue its operations in the ordinary course while the Debtor seeks to reorganize under the Bankruptcy Code. Accordingly, the Debtor respectfully requests that the Court enter those Orders.

                                                        */s/ Joyce Kersey*
                                                        JOYCE KERSEY

Sworn and subscribed to
before me this 19 day of
September, 2013

*/s/ Gregory G. Johnson*
Gregory G. Johnson, Esq.