UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**WONG FLEMING**
821 Alexander Road, Suite 200
Princeton, New Jersey 08540
Gregory Johnson, Esq.
(609) 951-9520
(609) 951-0270 Facsimile
gjohnson@wongfleming.com
*Proposed Counsel for Debtor and Debtor in Possession*

**DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP**
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Robert L. Rattet, Esq.
Dawn Kirby, Esq.
Julie Cvek Curley, Esq.
(914) 681-0200
(914) 684-0288 Facsimile
rrattet@ddw-law.com
dkirby@ddw-law.com
jcvek@ddw-law.com
*Proposed Co-Counsel for Debtor and Debtor in Possession*

| | |
|---|---|
| In re:<br><br>**LAFAYETTE YARD COMMUNITY DEVELOPMENT CORPORATION,**<br><br>Debtor. | Chapter 11<br>Case No. 13-30752 (MBK) |

<u>AMENDED</u>
**DEBTOR'S MOTION FOR ORDERS (A) AUTHORIZING DEBTOR
TO OBTAIN POST-PETITION FINANCING AND GRANTING SENIOR
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO 11 U.S.C. § 364(d); AND SCHEDULING A FINAL HEARING
<u>AND ESTABLISHING RELATED NOTICE REQUIREMENTS</u>**

To:      Honorable Michael B. Kaplan,
         United States Bankruptcy Judge

Lafayette Yard Community Development Corporation ("**LYCDC**", the "**Debtor**" or the "**Borrower**"), the debtor and debtor-in-possession in the above-captioned case (the "**Case**"), hereby moves (the "**DIP Motion**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an interim order (the "**Interim Order**"), *inter alia*,

(i) authorizing the Debtor to obtain senior secured postpetition financing on a superpriority basis (the "**DIP Facility**") pursuant to the terms and conditions of that certain Loan Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "**DIP Agreement**") by and between the Borrower and Racebrook Capital Advisors LLC ("**DIP Lender**"), substantially in the form attached hereto as **Exhibit A**;

(ii) authorizing the Debtor to execute and deliver the DIP Agreement and the other related credit documents (the "**DIP Documents**") by and between the Borrower and the DIP Lender, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Lender (collectively, and including all "**Obligations**" as described in the DIP Agreement, the "**DIP Obligations**") allowed superpriority administrative expense claim status in the Case and any Successor Cases (as defined herein);

(iv) granting to the DIP Lender, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(v)      authorizing and directing the Debtor to pay the

2

principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisors, accountants, and other consultants of the DIP Lender, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as limited pursuant hereto; and

(vii)  scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the DIP Motion and approval of the DIP Facility on a final basis and approving the form of notice with respect to the Final Hearing.

In support of the DIP Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.    Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 361, 362, 363 and 364, and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

4.    On September 23, 2013 (the "**Petition Date**"), LYCDC filed a voluntary petition for relief (the "**Petition**") under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey.

5.    The Debtor is continuing in possession of its property as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

6.      An official committee of unsecured creditors has not yet been formed in this Case.

7.      The Debtor owns and operates a landmark hotel located at 1 West Lafayette Street, Trenton, New Jersey, the State's capital (the "**Facility**"). Set amidst the attractions of downtown Trenton, the hotel is within walking distance to the New Jersey State Capital Complex, the Old Barracks, the New Jersey Soldiers and Sailors War Memorial and other historic sites. LYCDC is an ideal hotel for family vacations; it is ideally situated near Sesame Place, Six Flags Great Adventure, Waterfront Park and home to Trenton Devils hockey team and Trenton Thunder Baseball Team. LYCDC is also an ideal meeting location, offering state-of-the-art meeting facilities, dining and event planning services.

### SUMMARY OF THE DEBTOR'S PREPETITION INDEBTEDNESS[1]

8.      By Deed dated April 26, 2000, the 1 West Lafayette Street property, consisting of 3.7 acres of real property, designated Lot 106, Block 2, was conveyed by the City of Trenton, for itself and in its capacity as the City of Trenton Parking Utility, was transferred to LYCDC for the sum of $675,000.00.

9.      Subsequently, in 2001, LYCDC obtained tax exempt bond funding to construct the Facility.  Debt financing for the construction and acquisition of the hotel was specifically obtained with the issuance by LYCDC of bonds in 2000 in the approximate amount of $31,000,000 (the "**Series 2000 Bonds**").  The Series 2000 Bonds were subsequently refinanced by bonds issued by LYCDC in 2001 (the "**Series 2001 Bonds**").  The remaining principal balance of Series 2001 Bonds was refinanced by Hotel/Conference Center Project Revenue Refunding Bonds issued by LYCDC in 2012 (the "**Bonds**").  As of the Petition Date, Wells

---

[1] Other than to the extent set forth herein, the Debtor makes no representations or admissions as to the extent and validity of the liens asserted against it by various creditors described herein or those that later assert secured liens against the Debtor. The Debtor hereby reserves all rights to challenge said liens and preserve all defenses, set off rights and counterclaims they may have against the creditors.

Fargo Bank, N.A. is the indenture trustee (together with any successor indenture trustee, the "**Bond Trustee**") for the Bonds.

10.     As of the Petition Date, the Bond Claim includes:

(i)     Unpaid principal on the Bonds in the amount of $14,425,000;

(ii)    Accrued but unpaid interest on the Bonds in the amount of $228,165.76; and

(iii)   accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date in the approximate amount of $50,000 (the "Prepetition Expense Claim").

11.     As of the Petition Date the Debtor's books and records reflect loan obligations to other parties associated with the Facility that may be secured including: (a) a loan in the original principal amount of $2,000,000 from the New Jersey Economic Development Authority (the "**NJEDA Loan**"); (b) a loan in the original principal amount of $500,000 from the Capital City Redevelopment Corporation (the "**CCRC Loan**"), and (c) a loan in the original principal amount of $675,000 from the State of New Jersey (the "**State Loan**").  Any liens, security interests, rights and claims associated with the NJEDA Loan, CCRC Loan or State Loan are subject to and otherwise fully subordinate to the Bond Trustee's rights, liens and security interests in the Debtor's assets.

## THE DEBTOR'S NEED FOR POSTPETITION FINANCING

12.     The Debtor filed its Chapter 11 petition with the principal objective to reorganize through the marketing and competitive sale of its assets and business as a going concern under Bankruptcy Code § 363.  As a consequence of the factors described in the Affidavit of Joyce Kersey, the Debtor has insufficient cash to maintain business relationships with its vendors, suppliers, customers and employees, and, in the event that any or all of those relationships are adversely affected by the commencement of this Case, the Debtor will most likely face the

prospect of having insufficient cash to finance its operations, to pay its employees and to accomplish its goals for this Chapter 11 Case.

13.     The Debtor urgently needs credit and additional capital to mitigate any negative effect of this Case and to continue its business and operations so as to be able to implement and maximize a competitive sale process.  Absent availability of new credit, the Debtor's business will be severely and negatively impacted, which will in turn severely and negatively impact the going concern value of the hotel.

14.     Accordingly, the Debtor requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The DIP Facility will ensure adequate liquidity pending a sale and will further instill a sense of confidence in the Debtor's employees, customers, vendors, and other important stakeholders.  The Debtor critically needs the support of these stakeholders at this time, as the loss of their support could severely impair the Debtor's ability to maximize the value of its estate pending a sale.

15.     In sum, without the immediate access to post-petition financing, the Debtor expects to suffer immediate and irreparable harm to its estate and creditors.  The Debtor's ability to preserve the going concern value of its estate for the benefit of its creditors depends upon the interim and final relief requested in this DIP Motion.

## SUMMARY OF THE DEBTOR'S PROPOSED DIP FINANCING[2]

16.    The Debtor has determined, in the exercise of its sound business judgment, that to meet its working capital needs it requires a postpetition credit facility in substantially the form described herein.  Accordingly, subject to the Court's approval, the Debtor has determined to enter in the DIP Agreement with the DIP Lender.

17.    The terms of the DIP Facility are more specifically set forth in the DIP Agreement attached hereto as **Exhibit "A**."  The key provisions of the DIP Agreement are as follows:

Lender: Racebrook Capital Advisors LLC

Borrower: Lafayette Yard Community Development Corporation

Term Loan.  Until the Maturity Date, and prior to an Event of Default, Borrower may borrow up to two million dollars ($2,000,000) (the "**Maximum Loan Amount**") in one or more drawings by borrowing in accordance with the terms and conditions hereof, including the Budget. Once any portion of this Agreement has been paid or prepaid, it may not be re-borrowed. Borrowings under this Agreement (each such event being called an "**Advance**") will be available to Borrower as follows: (i) upon entry of the Interim Order (in form and substance satisfactory to Lender), but prior to entry of the Final Order, $200,000 of the Maximum Loan Amount; (ii) upon entry of the Final Order (in form and substance satisfactory to Lender), the balance of the Maximum Loan Amount, reduced by amounts drawn under Section 2(a)(i) and in accordance with the Budget; (iii) each Advance under this Agreement shall be made by wire transfer of immediately available funds to an account of Borrower designated by Lender (the "**Control Account**"); and (iv) each Advance shall be in increments of $500,000 provided that if the Maximum Loan Amount would limit the dollar amount of an Advance to less than $500,000, the Advance will be limited to the amount necessary to avoid exceeding the Maximum Loan Amount.

Rate of Interest:   On the Maturity Date, Borrower shall pay interest on the unpaid principal amount of this Agreement outstanding, accrued at a daily rate from the date of this Agreement through and including the Maturity Date, at a rate equal to 7% *per annum.* During the occurrence and continuance of an Event of Default additional interest shall accrue on the unpaid principal and interest of this Agreement at a rate equal to 12%

---

[2] The summaries and descriptions of the terms and conditions of the DIP Agreement and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order.  In the event there is a conflict between the DIP Motion and the DIP Agreement or the Interim Order, the DIP Agreement and/or the Interim Order, as applicable, shall control in all respects.  Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents and/or the Interim Order.

per annum or the maximum amount of interest allowable by applicable law (the "**Default Rate**"). Any judgments obtained for sums due hereunder shall accrue interest at the Default Rate until paid. Borrower shall pay an origination fee to Lender in the amount of 1% (One percent) of the Maximum Loan Amount in respect of this Agreement on the Closing Date. Borrower shall pay an origination fee to Lender in the amount of 1.5% (One and one-half percent) of the Maximum Loan Amount in respect of this Agreement on the Maturity Date.

Carve Out.  "Carve Out" means a carve-out for fees and expenses of professionals retained by the Borrower or an official committee of unsecured creditors appointed by the Bankruptcy Court in an aggregate amount not to exceed the sum of: (i) the dollar amount of such fees and expenses to the extent (a) incurred or accrued prior to an Event of Default (whether paid or unpaid); (b) provided for under the Budget; and (c) previously or subsequently allowed by court order; plus (ii) $50,000; plus (iii) the statutory fees of the United States Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of the Bankruptcy Court; provided that this Carve-Out, any cash collateral and any proceeds of this Agreement may not be used to investigate, or to prosecute a motion or an adversary proceeding contesting, or challenging the validity, perfection, priority, extent, or enforceability of this Agreement, or the Liens securing this facility, or any claims against Lender.

Lender's Expenses.  Borrower agrees to promptly pay all reasonable costs, charges and expenses incurred by Lender and its assigns (including, without limitation, reasonable costs of collection, court costs and reasonable and documented attorneys' fees and disbursements incurred in connection with the monitoring of and participation in the Case) in connection with the enforcement of Lender's rights under this Agreement.

Borrower shall be liable to the Lender for any reasonable costs and expenses (including, without limitation, all reasonable fees and disbursements of external counsel to the Lender) incurred by the Lender which may arise under, out of, or in connection with, this Agreement and any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, guaranties, reimbursement obligations, fees, indemnities, costs, expenses or otherwise; and any and all reasonable sums, costs and expenses which the Lender may pay or incur pursuant to the provisions of this Agreement or in defending, protecting or enforcing the Liens granted herein or otherwise in connection with the provisions hereof; in each case including without limitation (i) all reasonable search, filing and recording fees and expenses, (ii) all reasonable fees and expenses for the service and filing of papers, fees of marshals, sheriffs, custodians, auctioneers and others, reasonable travel expenses, court costs and collection charges, and (iii) all reasonable fees and expenses, appraisal fees, taxes, levies and reasonable attorneys' and accountants' fees and expenses in any suit, proceeding or action brought by the Lender under any Account or contract for any sum owing thereunder, or to enforce any provisions of any Account or contract, by reason of any defense, setoff, counterclaim, recoupment or reduction or liability whatsoever of the Account debtor or obligor thereunder, or otherwise (iv) in connection with the repossession, holding, preparation for sale and sale of the Collateral, (v) with respect to,

or resulting from any delay in paying, any and all excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral, or (vi) with respect to, or resulting from, any delay in complying with any Requirement of Law applicable to any of the Collateral: and all such liabilities shall be part of the obligations and shall be payable upon demand.

Further, Borrower agrees to pay, on a monthly basis, the reasonable fees and expenses of Lender's legal counsel arising from or related to the Agreement and the Case (including all reasonable out-of-pocket costs and expenses incurred by Lender in connection with the negotiation, preparation, execution and delivery of, and any amendment, supplement, waiver or modification to, the DIP Agreement, the Interim Order, the Final Order and any other documents or motions prepared in connection herewith or therewith, its monitoring of and involvement and participation in this chapter 11 case, and the consummation and administration of the transactions). Borrower also agrees to pay the fees and expenses of the financial advisor, appraisers, and other third-party consultants of Lender in connection with this Agreement and the Case.

DIP Liens.  In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens upon (collectively, the "**DIP Liens**"): (i) all of the personal property of Borrower, including, but not limited to, the following property (including Avoidance Actions and any proceeds thereof as of the entry of the Final Order), in each case, wherever located and now owned or at any time hereafter acquired by Borrower or in which Borrower now has or at any time in the future may acquire any right, title or interest (collectively, the "**Personal Collateral**") as security for the full and timely payment, observance and performance of this Agreement (defined terms used in this Section 6 but not otherwise defined in this Agreement have the meanings assigned to such terms in the UCC); and (ii) a first priority Lien on and security interest in, subject to the Permitted Encumbrances and the provisions hereof, and does hereby **MORTGAGE**, **GRANT A SECURITY INTEREST IN AND PLEDGE** to Lender and its successors and assigns forever, all of Borrower's estate, right, title and interest now owned or hereafter acquired in, to 1 West Lafayette Street, Trenton, New Jersey (the "**Property**"). Notwithstanding any other term of the DIP Agreement, Collateral, Personal Collateral and Property shall not include, and Borrower is not providing, and Lender is not receiving and shall not have any Lien, right, claim or interest in, on or to, any funds, cash, securities or investment property held or controlled by the indenture trustee under or pursuant to any resolution or other document evidencing or securing the Bonds from time to time, or any proceeds thereof or interest or earnings thereon. The Bonds referred to herein are more fully described in the Borrower's Cash Collateral Motion (Docket No. 3 in the Case).

DIP Lien Priority.  Subject to the Carve-Out, the obligations of the Borrower under this Agreement (i) pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed super-priority administrative expenses claims in the Case (the "**DIP**

**Administrative Claims**") and a Superpriority Claim having superpriority over any and all administrative expenses, diminution claims and all other claims against Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code or otherwise which superpriority claims shall be payable in accordance with the terms of the Orders; (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, are secured by a valid, binding, continuing, enforceable, fully-perfected, first priority Lien on, and security interest in, the Collateral.

**The Liens granted under this clause (2) shall be senior in all respects to the security interests in, and Liens on, the Pre-Petition  Secured Liens and (iii)(I) shall not be subject or subordinate to (A) any Lien or security interest** that is avoided and preserved for the benefit of Borrower and its estate under section 551 of the Bankruptcy Code **or (B) any Liens arising after the Petition Date or (II) subordinated to or made *pari passu* with any other Lien or security interest** under sections 363 or 364 of the Bankruptcy Code or otherwise.

The Prepetition Lenders have consented to their Prepetition Liens being primed by the DIP Facility Liens.

<u>Automatic Perfection of DIP Liens</u>.

The DIP Liens granted to the DIP Lender under the DIP Agreement and the Interim Order are valid, binding, continuing, enforceable and fully-perfected with the priorities herein and therein set forth.

<u>Conditions Precedent</u>.  The making of borrowings under this Agreement by Lender is subject to the satisfaction of the following conditions:

(a)      <u>Before the closing or the first Advance</u>:

(i)      Racebrook Marketing Concepts, LLC, D/B/A Sheldon Good & Company, a portfolio company of the Lender ("Sheldon Good & Company"), shall have received a signed engagement letter in form and substance agreeable to Sheldon Good & Company to serve as the Borrower's exclusive real estate auctioneer to perform an auction sale of the Borrower's real property and related business with a 1% commission payable at the closing of the sale approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, and upon such other and additional terms and conditions as (A) set forth in Sheldon Good & Company's proposal dated September 8, 2013, and (B) the Lender or Sheldon Good & Company shall have agreed upon with the Borrower.

(ii)      The Borrower shall have filed with the Court an application for the retention of Sheldon Good & Company as auctioneer under Bankruptcy Code sections 327 and 328.

(iii)    The Court shall have entered the Interim Order.

(iv)    All representations and conditions set forth in section 8(b)(ii) through (vi) of the DIP Agreement shall be satisfied.

(b)    <u>All other Advances</u>.  On the date of each subsequent Advance:

(i)    The Court shall have entered a final and non-appealable order authorizing the retention of Sheldon Good & Company as the Borrower's exclusive real estate auctioneer under Bankruptcy Code sections 327 and 328.

(ii)    The representations and warranties set forth herein shall be true and correct in all material respects on and as of the date of such Advance with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date (except that such materiality qualifiers shall not be applicable to any representation and warranty that is already qualified by materiality).

(iii)    At the time of and immediately after giving effect to such Advance, no Event of Default shall have occurred and be continuing (unless otherwise waived in writing by Lender).

(iv)    At the time of such Advance, either (i) the Interim Order shall be in full force and effect or (ii) if the date of such requested extension of credit is more than 30 calendar days after the Petition Date, the Final Order shall have been entered.

(v)    The making of such Advance shall not violate any requirement of applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(vi)    Each Advance shall be deemed to constitute a representation and warranty by the Borrower on the date of such Advance as to the matters specified in this Section 8(b).

(c)    <u>Deliverables</u>.  On or prior to the Closing Date:

(i)    Lender shall have received this Agreement, executed and delivered by a duly authorized officer of Borrower, and any deliverables required thereunder.

(ii)    Lender shall have been granted perfected Liens on the Collateral and shall have received, if applicable, any certificates or instruments representing and certificated equity interests or instruments accompanied by instruments of transfer, endorsed in blank.

(iii)    There shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or

impose burdensome conditions on Borrower, this Agreement, or the other transactions contemplated hereby, including the repayment hereof.

(iv)    Lender shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(v)    Morrison Cohen LLP, counsel to Lender, together with any local counsel to the Lender, shall have received payment of all fees, disbursements and other charges invoiced, due, and payable on or prior to the Closing Date.

(vi)    Lender shall have received, with respect to Borrower, (a) customary evidence of authority, (b) customary officer's certificates and other evidence of corporate authorization (including applicable constituent documents), (c) good standing certificates in jurisdiction of formation and (d) a notice of borrowing.

(vii)    Lender shall have received and approved the Budget in its sole discretion.

(viii)    Lender shall have received evidence satisfactory to Lender in its reasonable discretion of the entry of the Interim Order (i) approving this Agreement and (ii) granting the Superpriority Claim status and senior priming and other Liens described herein and in the Interim Order.

(ix)    All "first day orders" will be in form and substances reasonably satisfactory to Lender.

(x)    Sheldon Good & Company shall have received a signed engagement letter and copies of all retention applications and related materials, which shall be in form and substance agreeable to Sheldon Good & Company.

Budget.

(i)    Make all payments, incur expenses and all cash receipts received shall be in accordance with the Budget and such Budget will take into account all funds received by Borrower, subject to a permitted variance of 12.5% for all weekly disbursements in the aggregate. As used herein, a "permitted variance" shall include: (1) The payment or incurrence by the Borrower in any week of expenses of the types set forth in the Budget in amounts not exceeding the amounts for any expense line item set forth in the Budget for that week by the greater of twenty percent (20) percent or $20,000 (the " 20 Percent Test"); provided that to the extent amounts shown for specific expense line items set forth in the Budget for any week are not used, then to the extent those amounts, if used in that week, would not have caused an Event of Default based on the 20 Percent Test, such amounts may be carried over and used in whole or in part, in a subsequent week or months for purposes of the 20 Percent Test; or (2) the payment or incurrence by the Borrower in any week of expenses of the types set forth in the Budget in amounts not exceeding the aggregate amount for all expenses set forth in the Budget in that week by

more than twelve and a half (12.5) percent (the "12.5 Percent Test"); provided that, to the extent the aggregate amount for all expenses set forth in the Budget for any week is not used, then such amount may be carried over and used, in whole or in part, in a subsequent week or weeks for purposes of the 12.5 Percent Test.

(ii)      In the event that management of Borrower determines it necessary to take any action or make any payment in an emergency situation, management will obtain the prior written consent of the Lender, which consent may be obtained via e-mail.

Milestones.  Borrower shall consult with Lender in connection with carrying out the following Milestones (as defined below), including providing Lender with copies of the material documents prepared to achieve such Milestones in advance of their submission to the Bankruptcy Court:

(i)      (A) file the Borrower's schedules and statements of affairs with the Bankruptcy Court no later than sixty (60) days after the Petition Date;

(B) obtain entry of the (x) Interim Order by the Bankruptcy Court within five (5) Business Days following the Petition Date and (y) Final Order by the Bankruptcy Court no later than thirty (30) calendar days following the date of the Interim Order, in each case on terms that are in all respects satisfactory to Lender;

(C) to file with the Bankruptcy Court a motion seeking the entry of one or more Bar Dates for the filing of claims or Requests for payment of Administrative Expenses ("Bar Date Order(s)") no later than forty (40) calendar days after the Petition Date, such motion having been filed on or around September 24, 2013; and

(D) to obtain entry of one or more Bar Date Order(s) in each case on terms that are in all respects satisfactory to Lender, no later than forty (40) days after filing of a motion seeking the entry thereof; and

(E) obtain entry of an order or orders authorizing the auction and sale of all or substantially all of the Borrower's assets, including the scheduling of an auction to be held within five (5) weeks after the entry of an order retaining Sheldon Good & Company as the Borrower's real estate auctioneer upon terms and conditions acceptable to the Lender in its sole discretion, with a sale approval hearing to be held within two (2) business days after the auction; and

(each of the actions or events set forth in subsections (A) through (E), a "Milestone", and collectively, the "Milestones"); provided that, Lender may agree, in its sole discretion, to extend the applicable timing in connection with any of the Milestone.

(Key Covenants) - Financial Statements, Reports, Etc. Furnish to Lender:

(i)      as soon as possible after preparation, copies of financial statements prepared in the ordinary course of business;

(ii)      the Budget and updates as requested by Lender;

(iii)     Commencing within fourteen (14) days of the entry of the Interim Order, the Borrower is authorized and directed to provide to the Lender on Friday of each week, a weekly report certified by the Borrower's chief executive officer, chief restructuring officer or chief financial officer and in a form acceptable to the Lender indicating all receipts received by and disbursements made by the Borrower in the week ending the prior Friday compared to the Budget and detailing any variances from the expenditures and receipts as described in the Budget;

(vi)      as soon as possible, and in any event when Borrower's statement of financial affairs and schedules of assets and liabilities are required to be filed with the Bankruptcy Court (but no later than 30 days after the Petition Date or such later date as approved by the Bankruptcy Court), a pro forma balance sheet of Borrower's financial condition as of the Petition Date;

(vii)     copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of with the Bankruptcy Court in the Case, or distributed by or on behalf of Borrower to any official committee appointed in the Case;

(viii)    prompt notice of any of the following; (A) changes to any material customer contracts, and (B) any event that has or could reasonably be expected to result in a Material Adverse Effect or Change in Control;

(ix)      promptly provide any other information regarding (A) the operations, business affairs, or financial condition of Borrower, (B) compliance with the terms of any material contract entered into or assumed after the Petition Date and (C) information and updates regarding the achievement or progress towards the Milestones as Lender may reasonably request; and

(x)       cooperate with Lender's legal and financial advisors and promptly provide all information reasonably requested by Lender' legal and financial advisors with respect to Borrower.

      Maintaining Records; Access to Finances.  Keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP are made of all material dealings and transactions in relation to its business and activities. Borrower will permit any representatives designated by Lender to visit and inspect its respective financial records and properties at reasonable times during normal business hours on reasonable notice and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by Lender to discuss the affairs, finances and condition of Borrower with the officers thereof and independent accountants therefor provided that (i) any such visit or inspection shall be coordinated through Lender and (ii) in respect of any such discussions with any independent accountants, Borrower, as the case may be, shall have received reasonable advance notice thereof and a reasonable opportunity to participate therein.

      Events of Default;

(a)    Events of Default.  The following shall constitute events of default ("Events of Default") under this Agreement:

(i)    a default in the payment of any interest on any of the Agreements as and when the same shall become due and payable or the failure to make any adequate protection payments when due;

(ii)    a default in the payment of all or any part of the principal of any of the Agreements as and when the same shall become due and payable either at maturity, by declaration, acceleration or otherwise, whether or not prohibited by any provisions hereof;

(iii)    a failure on the part of Borrower to duly observe or perform any of the covenants or agreements on the part of Borrower contained in this Agreement;

(iv)    any representation, warranty or statement made or deemed made by Borrower herein shall prove to be false or misleading in any material respect when so made;

(v)    there is entered against Borrower a judgment or levy upon the Collateral where such judgment or levy is equal to or greater than $25,000, which remains uncured for five (5) business days;

(vi)    there is a taking of possession of a substantial part of the Collateral;

(vii)    any Lien being granted or placed upon the Collateral other than the lien of Lender and Permitted Liens;

(viii)    a Material Adverse Effect in the financial condition of Borrower, as determined by Lender in its sole discretion;

(ix)    one or more judgments or orders as to any obligation arising after the Petition Date in excess of $10,000 (to the extent not covered by independent third-party insurance) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against Borrower and shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Borrower to enforce any such judgment;

(x)    there shall have occurred a Change of Control;

(xi)    the appointment of an examiner with expanded powers or a trustee in the Case, conversion of the Case to a case or Case under chapter 7 of the Bankruptcy Code or dismissal of the Case by order of the Bankruptcy Court;

(xii)  the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder of any security interest to permit foreclosure (including under Article 9 of the Uniform Commercial Code and/or applicable state law) on any assets of the Borrower with a value equal to or greater than $10,000;

(xiii)  any order of the Bankruptcy Court shall be entered amending, modifying, superseding, staying, reversing or vacating any of the Orders or having the effect of doing so without the prior written consent of Lender;

(xiv)  Borrower's failure to achieve any of the Milestones described in the Agreement (except to the extent that Lender has agreed in writing, in its sole discretion, to extend the applicable timing in connection with any of the Milestones), and such failure shall continue unremedied for a period of two (2) days after written notice thereof from Lender to Borrower;

(xv)  the making of any material cash payment by the Borrower other than payments authorized by the Orders;

(xvi)  the termination by the Bankruptcy Court of the Borrower's exclusive period to file a plan under Section 1121 of the Bankruptcy Code, or the lapsing of such exclusive period;

(xvii)  Borrower's failure to perform or comply with Bankruptcy Court orders in any material respect;

(xviii) any breach by Borrower of any material term or condition of the Interim Order or the Final Order, as applicable;

(xix)  the payment of, or filing of a motion or other pleading Borrower for authority to pay, any pre-petition claim or administrative expense arising under Section 503(b)(9) of the Bankruptcy Code except as may be provided for in the Interim Order or the Final Order, as applicable, or this Agreement or as may be approved by the Bankruptcy Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to Lender;

(xx)  the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Lender or any of the Collateral;

(xxi)  The Court fails to enter an order retaining Sheldon Good & Company as exclusive auctioneer, or such order is overturned on appeal;

(xxii)  Sheldon Good & Company is terminated as auctioneer (unless such termination is for cause); or

(xxiii) the entry of an order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of Borrower that does not contemplate sufficient funds to pay Lender's claims under this Agreement in full on the effective date thereof to which Lender does not expressly consent in writing.

Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, subject to the Orders (but without prejudice to any rights granted therein), after the occurrence and continuance of an Event of Default and upon seven (7) Court Days' written notice of such Event of Default from Lender to Borrower (with a copy to the indenture trustee for the Bonds), Lender shall have the right to declare the entire unpaid principal amount of this Agreement together with all accrued but unpaid interest and any unpaid fees and expenses incurred by Lender immediately due and payable. Borrower hereby waives presentment, protest, demand, notice of dishonor and all other requirements of any kind. Lender's failure to exercise any right or remedy under this Agreement or acceptance of partial or delinquent payments, shall not be a waiver of any obligation of Borrower or right of Lender, or constitute Lender's waiver of any other default subsequently occurring. The remedies set forth herein shall be in addition to, and not in lieu of, any other additional rights or remedies to which Lender may be entitled, whether at law, in equity or otherwise.

After the occurrence and continuance of an Event of Default and upon written notice of such Event of Default from Lender to Borrower, Lender shall have the right to take all or any actions and exercise any remedies available to a secured party under this Agreement or applicable law or in equity subject to any requirements set forth in the Orders and the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated and Lender shall have the right to exercise any of the remedies under this Agreement, including any rights and remedies provided in the Orders and the right to realize on all of the Collateral without relief or order of the Bankruptcy Court except as provided in the Orders.

Lender shall have the right to credit bid this Agreement under section 363 of the Bankruptcy Code or pursuant to the Plan or any other plan of reorganization in the Case.

Extraordinary Provisions:

i)      Collateral shall include any and all causes of action of the Debtor and its estate under sections 544, 545, 547, 548, 549, 550, 553 and 724 of the Bankruptcy Code and any proceeds thereof and any and all other claims and causes of action of the Debtor and its estate (except for claims and causes of action constituting or relating to the Collateral, including but not limited to collections of accounts receivable and insurance claims). For the avoidance of doubt, the DIP Liens shall prime any and all pre-existing security interests, including the Prepetition Liens.

ii)     effective upon entry of a Final Order, at the DIP Lender's election the Court will conduct a 363 sale on not less than 20 days' notice of all or such part of the Collateral designated by the DIP Lender, in its sole discretion, and on terms acceptable to the DIP

Lender, in its sole discretion, with all proceeds to be used to pay the DIP Facility in the manner set forth in the DIP Agreement (and with the DIP Lender preserving the right to credit bid in such sale, whether conducted under section 363 or pursuant to a plan).

iii) at the DIP Lender's election, without further order of the Court, the DIP Lender shall have automatic and immediate relief from the automatic stay with respect to the Collateral (without regard to the passage of time provided for in Bankruptcy Rule 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to it under the DIP Agreement, the Interim Order and applicable nonbankruptcy law with respect to the Collateral.

iv) Surcharge.  Subject to the Final Order, at no time during the case shall the surcharge provisions of § 506(c), the enhancement of collateral provisions of § 552, or any other legal or equitable doctrine (including unjust enrichment) be imposed upon the DIP Lender or any of the Collateral for the benefit of any party in interest, including the Debtor, any statutory committee, creditors, any of the professionals subject to the Carve-Out or any trustee.

Except as set forth in the Interim Order, no costs or expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender.

## **REQUEST FOR APPROVAL OF THE DIP FACILITY**

18.     As described above, it is essential to the success of the Case that the Debtor immediately obtain access to sufficient post-petition financing, without which the Debtor's ability to maintain its business operations will be compromised.  The Debtor's continuing ability to maximize the value of its estate for the benefit of its creditors, and its ability to pursue the Proposed Sale at the Auction thus depend heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

19.     Section 364 of the Bankruptcy Code[3] distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the

---

[3] Section 364(c) of the Bankruptcy Code provides as follows:

ordinary course of business and (c) obtaining credit with specialized priority or with security.  If

a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to

Section 364(c) of the Bankruptcy Code, a court may authorize a debtor-in-possession to obtain

credit or incur debt, repayment of which is entitled to superpriority administrative expense status

or is secured by a senior lien on unencumbered property or a junior lien on encumbered property,

or combination of the foregoing.  Pursuant to section 364(d) of the Bankruptcy Code,[4] a court

may authorize a debtor-in-possession to obtain credit or incur debt secured by a senior or equal

lien on property of the estate that is already subject to a lien.

20.    As a condition to entering into the DIP Agreement and obtaining the Debtor's

needed liquidity, the Debtor must obtain authorization, pursuant to sections 364(c) and (d) of the

---

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of
this title as an administrative expense, the court, after notice and a hearing, may authorize
the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in
section 503 (b) or 507 (b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a
lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[4] Section 364(d) of the Bankruptcy Code provides as follows:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the
incurring of debt secured by a senior or equal lien on property of the estate that is subject
to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of
the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

Bankruptcy Code, (a) to grant the DIP Lender automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, and (b) grant the DIP Obligations allowed Superpriority administrative expense claim status in the Case and any Successor Case.

**A.  Approval Under Section 364(c) of the Bankruptcy Code**

21.     The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense."  *See In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

**B.  The Debtor Was Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis Under Section 364(a) or (b) of the Bankruptcy Code**

22.     As set forth in the Kersey Affidavit, and as the evidence at the Final Hearing will show, the Debtor could not have obtained a working capital/loan facility of the type and magnitude required in this Case on an unsecured or even junior secured basis.

23.     To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by good faith effort that credit was not available without" the protections

of section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re

Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to

seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* at

1088; *see also Ames,* 115 B.R. at 40 (holding that debtor made a reasonable effort to secure

financing where it approached four lending institutions, was rejected by two, and selected the

least onerous financing option from the remaining two lenders).  Moreover, where few lenders

are likely to be able and willing to extend the necessary credit to the debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for

financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom*,

*Anchor Savings Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

24.     The Debtor submits that, other than the DIP Facility, there are no better financing

alternatives available under the circumstances.  As this Court is undoubtedly aware, in the

current economic environment, the financing options for a wide variety of companies,

particularly those involved in sub-prime financing, are extremely limited.

25.     Moreover, as noted above, virtually all of the Debtor's assets are encumbered by

liens and security interests.  Alternative financing in an amount sufficient to repay those creditors

and provide additional liquidity is simply not available given the current state of the financial

markets, the nature and state of the Debtor's business operations and the size of the financing

required.  Even if alternative debtor-in-possession financing were available on favorable terms

and conditions and could be consummated in a time frame required to address the Debtor's

liquidity needs, obtaining such financing would likely result in a difficult and protracted priming

contest with the Prepetition Secured Lender, the results of which could not be predicted with

certainty.   Any uncertainty occasioned by protracted financing litigation would be extremely

damaging to the Debtor, immediately jeopardizing its Chapter 11 case at the outset.

### C.  **Approval of Priming Liens**

26.     If a debtor-in-possession is unable to obtain credit under the provisions of section

364(c) of the Bankruptcy Code, the debtor-in-possession may obtain credit secured by a senior or

equal lien on property of the estate that is already subject to a lien, commonly referred to as a

"priming lien."  11 U.S.C. § 364(d).  Section 364(d) of the Bankruptcy Code, which governs the

incurrence of postpetition debt secured by priming liens, provides that the court, after notice and

hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior

or equal lien on property of the estate that is subject to a lien only if –

>  (A) the trustee is unable to obtain such credit otherwise; and

>  (B) there is adequate protection of the interest of the holder of the
>  lien on the property of the estate on which such senior or equal lien
>  is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.     As discussed above, the Debtor has explored alternatives and lacks alternative

financing options.  In light of that, and given the state of the credit markets, the Debtor has

concluded that financing comparable to that provided by the DIP Lender under the DIP Facility

is currently unobtainable without the priming of the prepetition liens.  *See In re Utah 7000,*

*L.L.C.,* 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding that the debtor unable to

obtain financing without priming of prepetition liens); *In re Mosello,* 195 B.R. 277, 287 (Bankr.

S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 630-31 (Bankr.

S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)

(same).

28.     Thus, the Debtor is unable to obtain alternative post-petition financing through

credit allowable on an unsecured basis and without granting priming liens.     In these

circumstances, the Debtor, in the exercise of its considered business judgment and in

consultation with its professional advisors, has determined that the financing provided by the

DIP Facility is the most favorable under the circumstances and provides the Debtor the liquidity

necessary to maintain the going concern value of its business pending the conclusion of the

Debtor's proposed sale process.

29.     In addition, the Debtor submits that the adequate protection to be provided to the

Prepetition Secured Lender, as detailed below, is sufficient to approve the priming of its liens

under section 364(d) of the Bankruptcy Code.

### D.  The Postpetition Loan is Necessary to Preserve Assets of the Debtor's Estate

30.     As stated above, the DIP Facility is essential so that the Debtor can continue to

keep its operations running and immediately instill its employees, suppliers and customers with

confidence in the Debtor's ability meet its obligations to these important stakeholders while it

conducts an orderly marketing and competitive sale process.  Absent such confidence, the Debtor

will not have the resources or support necessary to maintain operations and preserve its value as

a going concern.

31.     The success of this case thus depends on the confidence of the Debtor's

employees, vendors, and customers.  If the DIP Motion is denied or delayed, that confidence

may be destroyed, and the success of the Chapter 11 case might be irreparably damaged.  In

contrast, once the DIP Facility is approved, the Debtor's ability to provide employees (through a

third-party management agreement to be funded under the DIP facility), vendors, customers, and other important stakeholders with the necessary confidence will be assured.  The Debtor's needs for access to the DIP Facility are, therefore, urgent and immediate.

  E. **The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

  32. In the Debtor's considered business judgment, the DIP Facility is the best financing option available in the circumstances of this case.  The purpose of the facility is to enable the Debtor to maintain the value of its estate while pursuing a going concern sale of the Debtor's business for the benefit of all stakeholders.

  33. The proposed DIP Facility provides, generally, that the liens and super priority claims granted to the DIP Lender with respect to the DIP Facility shall be subject and subordinate to a carve-out of the DIP Liens equal to the sum of (i) allowed, accrued, but unpaid professional fees and expenses of Borrower as set forth in the Budget (on a cumulative basis) incurred prior to an Event of Default not otherwise cured or waived by Lender, (ii) allowed, accrued, but unpaid professional fees and expenses of Borrower incurred in the Case after an Event of Default (that is not waived or cured) not to exceed an amount equal to $50,000 and (iii) the payment of fees pursuant to 28 U.S.C. § 1930; provided that this Carve-Out, any cash collateral and any proceeds of this Agreement may not be used to investigate, or to prosecute a motion or an adversary proceeding contesting, or challenging the validity, perfection, priority, extent, or enforceability of this Agreement, or the Liens securing this facility, or any claims against Lender (collectively, the "Carve-Out"), subject to the rights of the DIP Lender, and any other party in interest to object to the award of any such fees and expenses.  In *Ames Department Store,* the bankruptcy court found that such "carve-outs" are not only reasonable but are

necessary to insure that official committees and debtors' estates are adequately assisted by

counsel. *Ames,* 115 B.R. at 40.

### F.   Application of the Business Judgment Standard

34.   After appropriate and extensive investigations and analysis, and robust, good

faith, and arm's length negotiations among the Debtor and the DIP Lender, the Debtor's

management concluded that the DIP Facility and the use of Cash Collateral is the best alternative

available in the circumstances of these cases.   Bankruptcy courts routinely defer to a debtor's

business judgment on most business decisions, including the decision to borrow money, unless

such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility

were approved because they "reflect[ed] sound and prudent business judgment on behalf of

TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its

creditors"); *In re TM Carlton House Partners, LTD,* 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988)

(holding that due to the debtor's distinct awareness of its own financial needs, the court would

not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts);

*cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943)

(holding that decisions regarding the rejection or assumption of a lease is left to the business

judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business

judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.,*

37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14

(Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-

possession's business decisions when those decisions involve "a business judgment made in

good faith, upon a reasonable basis, and within the scope of his authority under the Code").   In

fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

35.     The Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Facility.  The terms of the DIP Agreement are fair and reasonable and are in the best interests of the Debtor's estate.  Accordingly, the Debtor should be granted authority to enter into the DIP Agreement and obtain funds from the DIP Lender on the senior secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### GOOD FAITH

36.     The Debtor submits that the terms and conditions of the DIP Facility and the DIP Agreements, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the circumstances.  As stated above, the Debtor, the DIP Lender and the Prepetition Secured Lender negotiated the terms and conditions of the DIP Agreement and the use of Cash Collateral in good faith and at arm's length.  Moreover, the Debtor's decision to enter into the DIP Agreement was an exercise of the Debtor's prudent business judgment.  Therefore, the DIP Lender and the Prepetition Secured Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Agreements, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

37.     The Interim Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claim; (b) permit the Debtor to perform such acts as the DIP Lender or any Prepetition Secured Lender may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the DIP Lender and the Prepetition Secured Lender under the DIP Documents, the DIP Facility, and the Interim Order; and (d) authorize the Debtor to pay and the DIP Lender and the Prepetition Secured Lender to retain and apply payments made in accordance with the terms of the Interim Order.

38.     Stay modification provisions of this type are customary features of post-petition debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

39.     In order to successfully implement the foregoing, the Debtor respectfully requests that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the twenty-day stay provided for by Bankruptcy Rule 6003(b), and the ten-day stay provided for by Bankruptcy Rule 6004(h).  The Debtor believes, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

## REQUEST FOR WAIVER OF STAY

40.      The Debtor further seeks a waiver of the stay of the effectiveness of the Interim

Order, and any subsequent Order, that may be imposed by any applicable Bankruptcy Rule.  As

set forth above, the use of Cash Collateral is essential to prevent potentially irreparable damage

to the Debtor's operations, value and ability to reorganize.  Accordingly, the Debtor submits that

sufficient cause exists to justify a waiver of any stay imposed by the Bankruptcy Rules, to the

extent applicable.

## REQUEST FOR HEARING ON SHORTENED NOTICE FOR INTERIM RELIEF

41.      In connection with the relief requested in the Motion herein, the Debtor is seeking

a hearing on shortened notice to consider authority to, *inter alia*, authorization to obtain DIP

financing, and use the cash collateral of the DIP Lender on an interim basis pursuant to §§364(d)

and 363(c)(2), and 361 of the Bankruptcy Code  and Federal Rule of Bankruptcy Procedure 4001.

42.      As stated hereinabove, the Debtor is currently operating at a loss, and has

inadequate cash flow and working capital. Prior to the Filing Date, the Debtor had exhausted

substantially all of its cash assets, and was left in a position without cash to continue its

operations. The Debtor explored numerous avenues of lending pre-filing, but, however, was

unable to find any lender willing to lend to the Debtor given its current debt structure. The only

avenue by which any lender would consider lending to the Debtor would be if the proposed

lender would "prime" the existing secured creditors, under Section 364(d) of the Bankruptcy

Code.

43.      In order to preserve the Debtor's assets and value as a "going concern" pending a

sale in this Bankruptcy Case, DIP Financing is necessary to provide the Debtor with adequate

cash flow to meet its very minimum operating expenses and administrative costs of maintaining

its estate.

44.     As set forth in the budget annexed as **Exhibit "B**," the Debtor immediately requires financing to meet its ordinary and necessary expenses. The Debtor does not have any cash reserves to sustain its operations, and thus immediate funding is necessary to prevent irreparable harm and damage to the Debtor's estate.

45.     Furthermore, the immediate and continued use of cash collateral is essential to the operation of the Debtor's business and value of its assets, and will not only preserve the estate but will help to maximize its value for the benefit of its creditors. Without the immediate, pre-final hearing authority to use cash collateral on an interim basis and pending the final hearing, the Debtor will not be able to make payroll and other imminent and necessary expenses to sustain its operations. If the Debtor is not permitted to immediately use cash collateral, the Debtor's business will be in jeopardy by virtue of the Debtor's inability, under such circumstances, to pay its employees and the daily costs and expenses associated with its daily business operations. As such, the Debtor submits that its request for interim use of cash collateral herein is reasonable, proper and in the best interests of its creditors.

46.     The Debtor therefore desires to obtain authority to obtain DIP Financing and use cash collateral of the DIP Lender on an interim basis pending a final hearing, pursuant to and in accordance with the Budget.

47.     The Bankruptcy Rules provide for a shortening of time under certain circumstances. Bankruptcy Rule 9006(c) provides as follows:

(c) *Reduction.*

(1) *In General*. Except as provided in paragraph (2) of this subdivision, when an act is required or allowed to be done at or within a specified time by these rules or by a notice given thereunder or by order of court, the court for cause shown may in its discretion with or without motion or notice order the period reduced.

(2) *Reduction Not Permitted.* The court may not reduce the time for taking action under Rules 2002 (a)(4) and (a)(8), 2003(a), 3002(c), 3014, 3015, 4001(b)(2), (c)(2), 4003(a), 4004(a), 4007(c), 8002, and 9033(b).

48.    Thus, the Bankruptcy Rules specifically authorize the Court to hear a motion such as the Motion herein on shortened notice, for cause shown.

49.    The Debtor respectfully submits that sufficient cause exists for scheduling a hearing on shortened notice to consider the Motion and refers the Court to the Affidavit of Joyce Kersey Pursuant to Local Bankruptcy Rules 1007-2 and 9077-1 in support of an order scheduling hearing on shortened notice on First Day Motions, which is on file on the Court's docket.

50.    Notice of this Motion will be provided as set forth in the Order Scheduling Hearing to be entered by the Court. The Debtor submits that said notice is adequate and proper.

51.    In the event the Court does not find cause to shorten the notice period for this Motion, this Motion will be provided on twenty-one (21) days notice to (i) Office of the United States Trustee; (ii) parties who have filed notices of appearance; and (iii) all creditors. The Debtor submits that said notice is adequate and proper.

## NOTICE WITH RESPECT TO FINAL ORDER

52.    Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to provide notice of the Final Hearing on this Motion by serving a copy of the Motion (to the extent not previously served), together with the Interim Order, in accordance with the terms provided in the Interim Order.

53.    The cost of mailing a notice to the Debtor's unsecured creditors would be exceedingly expensive, and would not, in the Debtor's view, confer any substantial benefit on the Debtor, its estate or its creditors.  Accordingly, and in light of the urgency of the relief

requested, the Debtor respectfully requests that any further notice of the Final Hearing, and of the relief requested, other than as provided for in this Motion, be dispensed with and waived.

## NO PREVIOUS RELIEF REQUESTED

54.    The Debtor has not previously sought the relief requested herein from this Court or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) GRANT the Motion, (ii) enter the Interim Order, substantially in the form attached hereto, granting the relief requested; (iii) set the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Respectfully Submitted,

**WONG FLEMING**
*Proposed Counsel to the Debtor and Debtor-in-Possession*

By:   /s/ Gregory G. Johnson
        Gregory G. Johnson, Esquire.

-and-

**DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP**
*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

By:   /s/ Robert L. Rattet
        Robert L. Rattet, Esquire

Dated: September 24, 2013